## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MSP RECOVERY CLAIMS, SERIES 44, LLC, ) <br> ) <br> **Plaintiff,** ) <br> ) <br> **v.** ) <br> ) <br> **QUINCY MUTUAL FIRE INSURANCE** ) <br> **COMPANY and QUINCY MUTUAL GROUP,** ) <br> **INC.,** ) <br> ) <br> **Defendants.** ) | **Case No. 22-cv-11271-DJC** |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                    **June 21, 2023**

## I.      Introduction

Plaintiff MSP Recovery Claims, Series 44, LLC ("MSPRC 44") has filed this lawsuit pursuant to the Medicare Secondary Payer Act ("MSPA" or "the Act") as the assignee of a Medicare Advantage Organization ("MAO"), Blue Cross Blue Shield of Rhode Island ("BCBSRI"). Defendants Quincy Mutual Fire Insurance Company and Quincy Mutual Group, Inc. (collectively, "Defendants") are insurers that issue liability and no-fault policies and often settle claims for injuries that result from accidents involving their insureds. In connection with some of those settlements, MSPRC 44 alleges that Defendants failed to reimburse BCBSRI for medical expenses it paid and for which Defendants were responsible. Accordingly, MSPRC 44 asserts a claim pursuant to the MSPA's private cause of action, 42 U.S.C. § 1395y(b)(3)(A), for those medical expenses (Count I) and a claim for declaratory relief (Count II). D. 1. For the following reasons, the Court ALLOWS Defendants' motion for judgment on the pleadings. D. 29.

1

## II.      Standard of Review

Rule 12(c) allows a party to move for judgment on the pleadings at any time "[a]fter the pleadings are closed—but early enough not to delay trial."  Fed. R. Civ. P. 12(c).  A Rule 12(c) motion for judgment on the pleadings is "ordinarily accorded much the same treatment" as a Rule 12(b)(6) motion.  Aponte-Torres v. Univ. of P.R., 445 F.3d 50, 54 (1st Cir. 2006) (citing cases).  To survive a motion for judgment on the pleadings, therefore, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  Because a motion for judgment on the pleadings "calls for an assessment of the merits of the case at an embryonic stage," the Court "view[s] the facts contained in the pleadings in the light most favorable to the nonmovant and draw[s] all reasonable inferences therefrom'" in their favor.  Perez-Acevedo v. Rivero-Cubano, 520 F.3d 26, 29 (1st Cir. 2008) (citation and internal quotation marks omitted).

On a Rule 12(c) motion, unlike a Rule 12(b) motion, the Court considers the pleadings, including the answer.  See Aponte-Torres, 445 F.3d at 54–55 (citation omitted).  In addition, "[t]he court may supplement the facts contained in the pleadings by considering documents fairly incorporated therein and facts susceptible to judicial notice."  R.G. Fin. Corp. v. Vergara-Nunez, 446 F.3d 178, 182 (1st Cir. 2006) (citation omitted).

## III.     Background

Because the allegations here relate to several aspects of the MSPA, the Court begins with an overview of the Act.

### A.      <u>Statutory Background</u>

Established in 1965, Medicare, which consists of Parts A and B, is administered by the Centers for Medicare & Medicaid Service ("CMS").  See 42 U.S.C. §§ 1395c–1395w-6.  Parts A

and B are fee-for-service provisions, which "entitle eligible persons to have [the] CMS pay medical providers directly for hospital and outpatient care." MSP Recovery Claims, Series LLC v. Plymouth Rock Assurance Corp., 404 F. Supp. 3d 470, 475 (D. Mass. 2019) (citing 42 U.S.C. §§ 1395c–1395w-6).

Under Parts A and B, "Medicare often acted as a primary insurer; that is, Medicare paid for enrollees' medical expenses, even when an enrollee carried other insurance that covered the same costs, or when a third party had an obligation to pay for them." MSP Recovery, LLC v. Allstate Ins. Co., 835 F.3d 1351, 1354–55 (11th Cir. 2016). In response, Congress enacted the MSPA in 1980 to reduce the costs of Medicare. United Seniors Ass'n v. Philip Morris USA, 500 F.3d 19, 21 (1st Cir. 2007) (citing cases). To do so, the MSPA "'inverted that system; it made private insurers covering the same treatment the "primary" payers and Medicare the "secondary" payer.' . . . Medicare benefits became an entitlement of last resort, available only if no private insurer was liable." Humana Med. Plan, Inc. v. W. Heritage Ins. Co., 832 F.3d 1229, 1234 (11th Cir. 2016) (quoting Bio-Med. Applications of Tenn., Inc. v. Cent. States Se. & Sw. Areas Health & Welfare Fund, 656 F.3d 277, 278 (6th Cir. 2011)). Accordingly, "[u]nder the current Medicare system, an automobile insurance provider or a similarly situated entity is the primary payer relative to Medicare or a[] MAO whenever its policy holders cause Medicare eligible expenses that are within its policy limits." Plymouth Rock Assurance Corp., 404 F. Supp. 3d at 475–76 (citing 42 U.S.C. § 1395y(b)(2)(A)); see 42 U.S.C. § 1395y(b)(2)(A) (defining "primary plan" broadly as "an automobile or liability insurance policy or plan (including a self-insured plan) or no fault insurance" which has a primary responsibility to pay).

The MSPA prohibits Medicare from paying a beneficiary's medical expenses if "payment has been made or can reasonably be expected to be made under . . . an automobile or liability

insurance policy or plan (including a self-insured plan) or under no fault insurance."  42 U.S.C. § 1395y(b)(2)(A)(ii).  Nevertheless, where a primary plan "has not made or cannot reasonably be expected to make payment with respect to [the] item or service promptly," Medicare may make the initial payment, "conditioned on reimbursement" from the primary plan.  Id. § 1395y(b)(2)(B)(i).  Reimbursement for these conditional payments is mandatory "if it is demonstrated that such primary plan has or had a responsibility to make payment with respect to such item or service."  Id. § 1395y(b)(2)(B)(ii).  Responsibility for payment may be shown in the following ways:

> a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) of payment for items or services included in a claim against the primary plan or the primary plan's insured, or by other means.

Id.

"In 1986, in an effort to 'encourage private parties to bring actions to enforce Medicare's rights' under the MSPA and thereby reduce instances of primary payers failing to cover costs or to reimburse [the] CMS, Congress created the MSPA's private cause of action."  Plymouth Rock Assurance Corp., 404 F. Supp. 3d at 476 (quoting United Seniors Ass'n, 500 F.3d at 22).  This private cause of action provides "for damages (which shall be in an amount double the amount otherwise provided) in the case of a primary plan which fails to provide for primary payment (or appropriate reimbursement) [as otherwise provided in the Act]."  42 U.S.C. § 1395y(b)(3)(A).

In 1997, Congress created Part C, which is the Medicare Advantage Program, under which Medicare-eligible beneficiaries may elect to receive their Medicare benefits through private insurers known as MAOs, rather than the CMS.  42 U.S.C. §§ 1395w-21–1395w-29; see Plymouth Rock Assurance Corp., 404 F. Supp. 3d at 476.  Under Part C, Medicare pays MAOs, like BCBSRI, an advanced, fixed amount per month for each beneficiary covered under the MAO's plan to

provide the same original Medicare benefits.  42 C.F.R. § 422.304(a).  "Congress's goal in creating the Medicare Advantage program was to harness the power of private sector competition to stimulate experimentation and innovation that would ultimately create a more efficient and less expensive Medicare system."  In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig., 685 F.3d 353, 363 (3d Cir. 2012) (citing H.R. Rep. No. 105-217, at 585 (1997) (Conf. Rep.)).

    B.    **Factual Background**

    Unless otherwise indicated, the following summary is based upon the facts as alleged in the complaint.  D. 1.

    MSPRC 44 and related entities are "collection agencies that specialize in recovering funds on behalf of various actors in the Medicare Advantage system."  MSP Recovery Claims, Series LLC v. ACE Am. Ins. Co., 974 F.3d 1305, 1308 (11th Cir. 2020); see D. 1 ¶¶ 9–10.  Pursuant to the MSPA's private right of action, MSPRC 44 filed this lawsuit as BCBSRI's assignee because Defendants are allegedly primary plans that failed to reimburse BCBSRI for payments it made.  D. 1 ¶¶ 4, 65.

    MSPRC 44 uncovered Defendants' alleged MSPA noncompliance "through data analytics, which requires cross-referencing unreimbursed, accident-related conditional payments in [BCBSRI's] claims data with instances where auto insurers reported to [the] CMS under Section 111 that they were responsible, which made them primary payers under the MSP Act as a matter of law."  Id. ¶ 21.  CMS reports, however, are not directly available to MSPRC 44.  Id.  To access those reports, MSPRC 44 subscribes to a service known as "MyAbility," which contracts with the CMS and provides subscribers with information that primary payers report to the CMS.  Id. ¶¶ 15, 21.  Nevertheless, MSPRC 44 does not possess claims information for each instance Defendants allegedly failed to reimburse BCBSRI.  Id. ¶¶ 22–23.  Accordingly, MSPRC 44 proffers and relies

upon two representative examples, M.H. and J.O., to illustrate Defendants' failure to fulfill their statutory obligations and to demonstrate Article III standing, but states that the full extent of its damages cannot be known until discovery.  Id. ¶¶ 23–24, 27–29.

On August 13, 2015, an individual named M.H., who was enrolled in a Medicare Advantage Plan issued by BCBSRI, was injured in an accident and sustained injuries that required medical items and services.  Id. ¶¶ 30–31.  These services were rendered on or about August 13, 2015 and August 21, 2015, and the medical providers charged BCBSRI $6,860.00, of which it paid $877.09.  Id. ¶ 33.  After the accident, M.H. initiated a claim against Defendants' insured, who was responsible for the accident.  Id. ¶¶ 32, 34.  Defendants indemnified their insured, made payments pursuant to a settlement with M.H. and reported information to the CMS regarding the accident.  Id. ¶¶ 34–35.  By virtue of entering into a settlement and reporting information to the CMS regarding the accident, MSPRC 44 alleges Defendants became the primary payer[1] responsible for payment and reimbursement of M.H.'s accident-related injuries.  Id.  Once Defendants reported information to the CMS regarding the accident, MSPRC 44 alleges that they were aware that they were obligated to reimburse BCBSRI, but have not reimbursed or notified BCBSRI of its primary responsibility to pay for M.H.'s medical expenses.  Id. ¶¶ 37–39.

Similarly, on September 19, 2015, an individual named J.O., who was enrolled in a Medicare Advantage Plan issued by BCBSRI, was injured in an accident and sustained injuries that required medical items and services.  Id. ¶¶ 43–44.  These services were rendered on or about September 20, 2015, September 21, 2015, and September 24, 2015, and the medical providers

---

[1] MSPRC 44 further alleges that Defendants ambiguously reported their primary payer status to the CMS by reporting "Quincy Mutual Insurance Group" as the plan name, which is not a legal entity and forced MSPRC 44 to name several potential defendants in this lawsuit until the proper reporting entity is identified.  Id. ¶¶ 36, 49.

charged BCBSRI $3,007.19, of which it paid $333.56.  Id. ¶ 46.  After the accident, J.O. initiated a claim against Defendants' insured, who was responsible for the accident.  Id. ¶¶ 45, 47. Defendants indemnified their insured, made payments pursuant to a settlement with J.O. and reported information to the CMS regarding the accident.  Id. ¶¶ 47–48.  By virtue of entering into a settlement and reporting information to the CMS regarding the accident, MSPRC 44 alleges Defendants became the primary payer responsible for payment and reimbursement of M.H.'s accident-related injuries.  Id.  Once Defendants reported information to the CMS regarding the accident, MSPRC 44 alleges that they were aware that they were obligated to reimburse BCBSRI, but have not reimbursed or notified BCBSRI of its primary responsibility to pay for J.O.'s medical expenses.  Id. ¶¶ 50–52.

On May 30, 2019, BCBSRI assigned all rights to recover payments made for its enrollees' healthcare services to MSP Recovery, LLC.  Id. ¶ 59.  Thereafter, on June 10, 2019, MSP Recovery, LLC assigned all the rights acquired from BCBSRI to Series 16-05-461, a designated series of MSP Recovery Claims, Series LLC.  Id. ¶ 60.  In turn, on October 22, 2020, Series 16-05-461 assigned all aforementioned rights to Series 44-20-461.  Id. ¶ 62.  Series 44-20-461 is a designated series entity of Plaintiff MSPRC 44.  Id. ¶ 14.

## IV.    Procedural History

MSPRC 44 initiated this lawsuit on August 5, 2022.  D. 1.  After filing an answer to the complaint, D. 13, Defendants moved for judgment on the pleadings, D. 29.  The Court heard the parties on the motion.  D. 38.  At the motion hearing, after Defendants proffered some additional caselaw regarding their standing-related arguments, the Court gave MSPRC 44 a week to respond to same.  Id.  The Court then took the matter under advisement.  Id.  A week later, MSPRC 44 filed

a supplemental brief, D. 39, which, along with other filings, the Court also has reviewed and considered.

## V.    Discussion

Defendants argue that judgment on the pleadings is warranted because:  (1) MSPRC 44 has not established standing; (2) MAOs and their assignees are excluded from the MSPA's private cause of action; (3) even assuming MSPRC 44 can assert the MSPA's private cause of action, it has failed to allege a plausible claim for relief under the MSPA; (4) the MSPA's private cause of action is unconstitutional; and (5) since MSPRC 44's claim under the MSPA cannot survive, there is no justiciable controversy to support declaratory relief on the same grounds.  D. 29-1 at 8–26.

### A.    <u>Standing</u>

Article III of the United States Constitution limits federal court power to resolving "justiciable cases or controversies."  <u>Becker v. FEC</u>, 230 F.3d 381, 384–85 (1st Cir. 2000) (citing <u>Allen v. Wright</u>, 468 U.S. 737, 750 (1984)).  "[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."  <u>Massachusetts v. U.S. Dep't of Health & Hum. Servs.</u>, 923 F.3d 209, 221 (1st Cir. 2019) (alteration in original) (quoting <u>DaimlerChrysler Corp. v. Cuno</u>, 547 U.S. 332, 341 (2006)) (internal quotation marks omitted).  Adhering to this principle requires plaintiffs to "establish that they have standing to sue."  <u>Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.</u>, 958 F.3d 38, 46 (1st Cir. 2020) (citation and internal quotation marks omitted).  Standing demands plaintiffs have "a sufficiently personal stake in the issue," <u>Becker</u>, 230 F.3d at 385, demonstrated through "(1) an injury-in-fact; (2) causation; and (3) redressability," <u>Steir v. Girl Scouts of the USA</u>, 383 F.3d 7, 14 (1st Cir. 2004) (citation omitted).

The party asserting jurisdiction bears the burden of establishing standing.  <u>Gustavsen v. Alcon Lab'ys., Inc.</u>, 903 F.3d 1, 7 (1st Cir. 2018) (citing cases).  At this stage in the proceedings,

the Court applies "the same plausibility standard used to evaluate a motion under Rule 12(b)(6)," by "first accept[ing] as true all well-pleaded factual averments in the plaintiff's . . . complaint and indulge all reasonable inferences therefrom in his favor," and "then ask[ing] whether the plaintiff has pleaded sufficient factual matter to plausibly demonstrate his standing to bring the action." Id. (internal citations and quotation marks omitted); see N. Sec. Ins. Co. v. Travelers Ins. Co. of Am., 531 F. Supp. 3d 467, 472–74 (D. Mass. 2021) (assessing standing challenge on a motion for judgment on the pleadings under the plausibility standard).

### 1. Injury-in-Fact

An injury-in-fact must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992) (citations and internal quotation marks omitted).  Here, MSPRC 44 alleges its injury-in-fact is Defendants' failure to reimburse BCBSRI for M.H.'s and J.O.'s accident-related medical expenses and for which Defendants were primary plans. D. 35 at 18–22.  In this context, to show injury-in-fact with respect to M.H.'s and J.O.'s claims, MSPRC 44 "must make adequate factual allegations to support a finding that (1) [BCBSRI] incurred medical expenses as a result of an accident suffered by the respective exemplar patient; (2) [BCBSRI] paid, but did not receive reimbursement, for those expenses; (3) [BCBSRI] assigned its claim for reimbursement to a Series LLC of [MSPRC 44]; and (4) [MSPRC 44] has the right to sue on behalf of the designated Series LLC that received the assignment." MSP Recovery Claims, Series LLC v. AIG Prop. Cas. Co. ("AIG I"), No. 20-CV-2102 (VEC), 2021 WL 1164091, at *4 (S.D.N.Y. Mar. 26, 2021), reconsideration denied, No. 20-CV-2102 (VEC), 2021 WL 3371621 (S.D.N.Y. Aug. 2, 2021); see MSP Recovery Claims, Series LLC v. Merchants Mut. Ins. Co., No. 1:19-cv-524-JLS-JJM, 2022 WL 2439410, at *4 (W.D.N.Y. Mar. 28, 2022) (same); MSP Recovery Claims, Series LLC v. Hereford Ins. Co. ("Hereford I"),

No. 20 Civ. 4776 (ER), 2022 WL 118387, at *6 (S.D.N.Y. Jan. 11, 2022), aff'd MSP Recovery

Claims, Series LLC v. Hereford Ins. Co. ("Hereford II"), 66 F.4th 77 (2d Cir. 2023) (same).

a)      Whether BCBSRI Incurred Medical Expenses as a Result of an
        Accident Suffered by M.H. and J.O.

To satisfy the first element, MSPRC 44 alleges that both M.H. and J.O. were injured in an

accident,[2] sustained injuries as a direct and proximate result of the accident and required medical

services and items to address their injuries.  D. 1 ¶¶ 31, 44.  To support these allegations, MSPRC

44 attaches spreadsheets to its complaint, which purport to list the diagnosis codes and injuries in

connection with the accident-related treatment, the dates on which medical services were rendered,

and the dates on which BCBSRI made payments.  See generally D. 1-2; D. 1-3.  The information

contained in these spreadsheets appears to have been gathered through a comparison of

information from MyAbility and BCBSRI.  D. 1 ¶¶ 15, 21–24.

Several courts, however, have recognized issues with pleadings that rely upon such

spreadsheets.  See, e.g., Merchants Mut. Ins. Co., 2022 WL 2439410, at *6 (explaining that

"[n]owhere, however, does plaintiff make factual allegations to link the diagnosis codes and the

procedure codes to actual diagnoses or treatments" and "[n]or does the [complaint] contain any

allegations that demonstrate how the information in each list ties the treatments reflected therein

to the exemplar beneficiaries or, aside from the date on the list, to the accidents allegedly covered

by defendants"); Hereford I, 2022 WL 118387, at *6 (noting that the "spreadsheet does not contain

the name of the patient who received medical services," "does not conclusively show that [the

---

[2] The complaint "never alleges what type of accident (e.g., automobile, slip-and-fall, bicycle, hunting, skiing).  The Court presumes that the patients were injured in vehicular accidents based on [MSPRC 44]'s focus on no-fault insurance, but the total lack of detail about what happened to [M.H. and J.O.] leaves the [C]ourt only with the assumption that the accident could implicate insurance."  AIG I, 2021 WL 1164091, at *5 n.5.

MAO] paid for the services," and included "discrepancies between the amounts alleged in the FAC and amounts billed and paid as reflected in the spreadsheet"); AIG I, 2021 WL 1164091, at *5 (noting that "the spreadsheets do not include fields for the name of the patient who received treatment or the name of the MAO that allegedly paid for the services").

Likewise, the spreadsheets upon which MSPRC 44 relies here do not include columns for the patient's name or the name of the MAO that allegedly paid for the services. See D. 1-2; D. 1-3. To the extent MSPRC 44 compiled this information from MyAbility and BCBSRI, D. 1 ¶¶ 15, 21–24, that could show a link between the data to M.H. and J.O., but the Court notes that "nothing on the actual exhibit confirms its source," MSP Recovery Claims, Series LLC v. N.Y. Cent. Mut. Fire Ins. Co., No. 6:19-CV-00211 (MAD/TWD), 2019 WL 4222654, at *5 (N.D.N.Y. Sept. 5, 2019).

Notwithstanding these issues, courts have concluded that such spreadsheets can satisfy plaintiff's burden at this stage to allege plausibly the MAO incurred medical expenses. Hereford I, 2022 WL 118387, at *7 (stating that "[n]otwithstanding these discrepancies, the Court finds that MSP has adequately alleged that EmblemHealth paid for medical services provided to N.G." (citation omitted)); AIG I, 2021 WL 1164091, at *6 (stating that "despite these issues, . . . when Plaintiff's evidence is evaluated without the problematic allegations, the Court can still find that Plaintiff has adequately, but barely, alleged that the four MAOs paid for medical care provided to the five exemplar patients"). Similarly, the Court concludes here that MSPRC 44 has plausibly alleged that the BSBSRI paid for M.H.'s and J.O.'s medical care.

      b)    Whether BCBSRI Paid for Services and Was Not Reimbursed by the Primary Plan

The next element requires MSPRC 44 to allege that BCBSRI "incurred reimbursable costs and [was] not reimbursed." AIG I, 2021 WL 1164091, at *6 (citation and internal quotation marks

omitted).  MSPRC 44 argues that the costs at issue are reimbursable because Defendants allegedly reported associated claims to the CMS and the act of reporting demonstrates that they are a primary payer under the MSPA.  D. 1 ¶¶ 21, 35, 37–38, 48, 50–51; D. 35 at 18–22; D. 39 at 2–6.  To support its argument, MSPRC 44 relies upon the MSPA's statutory language.

As noted above, under the MSPA, a primary plan's "responsibility" for a conditional payment can be "demonstrated by a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) of payment for items or services included in a claim against the primary plan or the primary plan's insured, or by other means."  42 U.S.C. § 1395y(b)(2)(B)(ii).  The MSPA also imposes certain reporting requirements on insurers.  For example, an insurer must "determine whether a claimant (including an individual whose claim is unresolved) is entitled to benefits under [Medicare] on any basis" and "if the claimant is determined to be so entitled, [the insurer must] submit the information" required by statute to the CMS.  Id. § 1395y(b)(8)(A)(i)–(ii).  The MSPA also indicates that these reports should be submitted "after the claim is resolved through a settlement, judgment, award, or other payment (regardless of whether or not there is a determination or admission of liability)."  Id. § 1395y(b)(8)(C).  In MSPRC 44's view, "[t]his 'after' language is key" because "[b]y making this report, Quincy admits making a 'payment' to M.H. and J.O. . . . [and] admits that payment 'resolve[d]' a 'claim' by the beneficiary for accident-related medical treatments."  D. 35 at 19.

In a factually similar case, the Second Circuit rejected this reasoning and theory of standing.  Hereford II, 66 F.4th at 86–89.  There, the Second Circuit concluded that "a [CMS] report . . . does not amount to an admission of liability" because such reporting is required where the insurer determines the claimant is entitled to benefits "on any basis," which "can mean benefits

to be paid by a primary plan, by Medicare itself, by a[] MAO, or by another source:  all such payments may be obligations owed 'under' the [MSPA]." Id. 86–87.  The court also explained that the MSPA requires reporting "regardless of whether or not there is a determination or admission of liability," which "signals unmistakably that a primary plan must report claims covered by the [MSPA] without considering its liability for those claims:  claims for which it is liable and claims for which it is not liable, alike, must be reported." Id. at 87.

This interpretation of the MSPA's statutory language, in the Second Circuit's view in Hereford II, is "reinforce[d]" by "[t]he statutory scheme" because "Section 111 requires primary plans to report more than the claims they are responsible for and fewer than all the claims they receive.  For example, they need not report claims made by individuals covered under a no-fault policy but who, because of their youth (for instance), are ineligible for Medicare." Id.  The statutory scheme also includes "steep penalties for failures to report and for untimely reporting," which "incentivizes over-reporting and early reporting, to further the purposes of the reporting requirement more generally: 'to enable the Secretary to make an appropriate determination concerning coordination of benefits, including *any applicable recovery claim*.'" Id. at 87–88 (italics in original) (quoting 42 U.S.C. § 1395y(b)(8)(B)(ii)).  This language—"any applicable recovery claims"—"reinforces the notion that a 'recovery claim' is a mere subset of the claims that a primary plan must report, not all, as MSP contends.  To coordinate benefit payments, Medicare logically needs data about *any* claims that it may have to pay, i.e., any claims made by Medicare beneficiaries." Id. at 88 (italics in original).

Furthermore, the Second Circuit explained that the CMS User Guide "confirms" this understanding of the significance—or lack thereof—of CMS reporting. Id.  According to the CMS User Guide, "primary plans must report any claims made by a Medicare beneficiary 'for both

Medicare claims processing and for MSP [Act] recovery actions, *where applicable*.'"   Id. (alteration and italics in original) (citing User Guide: Chapter I, at 6-1).  For the Second Circuit, this made clear that "a primary plan . . . is responsible for reporting any claim received by it that to its knowledge involves a Medicare beneficiary—not just the claims it should have paid as a primary payer or for which it may have to reimburse another payer."  Id. at 88.

MSPRC 44's makes several arguments to distinguish the analysis in Hereford II.  It argues that the Second Circuit "*only* addressed whether a primary plan's responsibility under the . . . MSPA . . . is conclusively demonstrated solely by its 'Section 111' report to the government" and did not address whether these reports coupled "with additional allegations such as: (1) that the primary plan has settled the reported claim; (2) the policy number of the insurance policy that funded the settlement; (3) that a . . . MAO . . . also made payments on the *same* claim; and (4) detailed descriptions of each coded procedure for which the MAO made payment" could satisfy the elements of standing.  D. 39 at 2 (italics in original).  That is, MSPRC 44 uses these reports "to establish only one half of this equation:  Quincy reported the claim 'after' resolving it 'through . . . payment'" and uses additional allegations taken from BCBSRI's payment data to establish the second half of this equation:  that "the claim is among that 'sub-set' of claims for which Medicare also paid."  Id. at 3, 5 (quoting 42 U.S.C. § 1395y(b)(8)(C)).

This Court finds the Hereford II analysis persuasive, as another session of this Court has similarly concluded, see MSP Recovery Claims, Series LLC v. Safeco Ins. Co. of Am., No. 22-CV-10809-RWZ, 2023 WL 3481586, at *1–2 (D. Mass. May 16, 2023) (relying upon Hereford II to dismiss a factually similar case for lack of standing); MSP Recovery Claims Series 44, LLC v. Arbella Mut. Ins. Co., No. 22-CV-11310-RWZ, 2023 WL 3481496, at *1–2 (D. Mass. May 16, 2023) (same), and finds MSPRC 44's attempts to distinguish same unavailing.  As an initial matter,

the lower court's decision in <u>Hereford I</u> makes clear that the plaintiff did not solely rely upon CMS reports there, but also included allegations as to policy numbers, that the MAO made payments on the same claims that were reported to the CMS, and descriptions of the coded procedures for which the MAO made payment.  <u>Hereford I</u>, 2022 WL 118387, at *3–4, 6.  Notwithstanding these additional allegations, the Second Circuit concluded, on <i>de novo</i> review, that the plaintiff did not have standing.  <u>Hereford II</u>, 66 F.4th at 79.

Significantly, MSPRC 44's arguments do not address the specific issue at play here.  Even assuming its statutory analysis is correct and reporting to the CMS, combined with their additional allegations, renders an insurer a primary payer, the Court is not persuaded that these allegations mean that any medical expense related to the claim is reimbursable by the insurer that reported the claim.  MSPRC 44 makes clear that its allegations, statutory analysis, and Defendants' CMS reporting "means Quincy admits primary payer status <i>for that accident</i>," not that Defendants admit primary payer status for each medical expense related to the reported claim. D. 35 at 19 (italics in original).  Indeed, other courts have noted that these allegations are insufficient to demonstrate that a particular insured is a primary payer or that it was responsible for specific costs—rejecting MSPRC 44's arguments.  <u>See, e.g.</u>, <u>Merchants Mut. Ins. Co.</u>, 2022 WL 2439410, at *7–9; <u>Hereford I</u>, 2022 WL 118387, at *7–8; <u>AIG I</u>, 2021 WL 1164091, at *6–7.

For example, the <u>AIG I</u> court dismissed a similar complaint for lack of standing after it recognized that "Plaintiff's underlying premise — if a claim is reported to [the] CMS, then any medical expense that may be associated with the claim is reimbursable by the entity that reported the claim — is factually inaccurate." <u>AIG I</u>, 2021 WL 1164091, at *6.  In reaching that conclusion, the court noted that "[a]nytime an insurance company becomes aware that a Medicare beneficiary was injured in an accident for which it (or a direct subsidiary) wrote a policy that may provide

coverage, the insurance company is obligated to report it to [the] CMS" and that defendants had proffered "several examples of claims that were reported to [the] CMS but the costs of the medical services associated with the claims were properly incurred by the MAO and were not reimbursable by the primary payer." Id.  Furthermore, the court explained that "[t]he CMS operating guidance makes clear that CMS reporting does not constitute an admission by the reporting entity that it is the primary plan in connection with the reported event; instead, such reporting simply confirms that the reporting entity or a direct subsidiary of the reporting entity *may* provide coverage for the accident." Id. at *12 (italics in original).[3]  Accordingly, the court had "no way to assess the likely overlap between the claims reported to [the] CMS and medical expenses incurred by insureds involved in those accidents that are ultimately reimbursable by the primary payer." Id. at *7.

Similarly, in Hereford I, the district court dismissed a similar complaint for lack of standing for these reasons and further noted that there are "scenario[s] in which multiple insurers would be statutorily required to report the same claim to [the] CMS, but the medical services and items associated with the claim would not be reimbursable by each and every insurer as a primary payer." Hereford I, 2022 WL 118387, at *7.  In Merchants Mut. Ins. Co., another court dismissed a similar complaint for lack of standing because "even if defendants' reporting demonstrated their awareness that they were the primary payer for some accident related expenses, this conclusion does not satisfy plaintiffs' burden to plead facts demonstrating that defendants were responsible for the disputed medical expenses." Merchants Mut. Ins. Co., 2022 WL 2439410, at *7.  Indeed,

---

[3] The relevant CMS operating guidance states that "[a]n entity **may** register as a[] [Responsible Reporting Entity] for itself or for any direct subsidiary in its corporate structure." MMSEA Section 111 Medicare Secondary Payer Mandatory Reporting, at 14 (July 1, 2019), https://www.cms.gov/Medicare/Coordination-of-Benefits-and-Recovery/Mandatory-Insurer-Reporting-For-Non-Group-Health-Plans/Downloads/New-Downloads/NGHPUserGuide-Version-56-Chapter-III_Policy-Guidance.pdf (last visited June 20, 2023) (emphasis in original).

as is the case here, the <u>Merchants Mut. Ins. Co.</u> court explained that the complaint did not "make any specific allegations concerning the information defendants provided to [the] CMS as part of their mandatory reporting that would enable the court to draw any conclusions concerning the statements made by defendants to [the] CMS concerning the type of coverage they provided, the claims they received, the nature of the alleged accidents, the injuries sustained by the beneficiaries, or the services provided to the beneficiaries."  <u>Id.</u>  Along those same lines, the court noted that "even if defendants' reports to [the] CMS represented admissions of primary payer status, the [complaint] makes no factual allegations from which the court can reasonably conclude that defendants acknowledged liability to pay for the treatments at issue here, even if those treatments were related to the accident."  <u>Id.</u>

MSPRC 44 argues that these courts have misunderstood the significance of CMS reporting, unlike certain Eleventh Circuit caselaw upon which it relies.  D. 35 at 19–20.  First, MSPRC 44 cites <u>MSP Recovery Claims, Series LLC v. Metro. Gen. Ins. Co.</u>, 40 F.4th 1295, 1298 (11th Cir. 2022), where the Eleventh Circuit considered whether the complaint plausibly alleged the elements of the MSPA's private cause of action.  To satisfy these elements, according to the Eleventh Circuit, "a plaintiff must plausibly allege that a defendant's responsibility to pay had been demonstrated before filing suit, and a defendant must have (at least constructively) known of such obligation."  <u>Id.</u> at 1304.  All that the court said regarding CMS filings, however, was that "CMS filings evidence [d]efendants' knowledge that they owed primary payments" and that the MSPA's reporting "provision obligates insurers like Defendants to report the claims for which they are primary payers."  <u>Id.</u> (alteration in original) (citations and internal quotation marks omitted).  This analysis does not address the precise question raised by Defendants here—namely, whether CMS

reports demonstrate that any medical expense related to the claim is reimbursable by the insurer that reported the claim.

Similarly, the second case upon which MSPRC 44 relies does not answer this question.  In MSP Recovery Claims, Series LLC v. ACE Am. Ins. Co., 974 F.3d 1305, 1319 (11th Cir. 2020), the Eleventh Circuit addressed whether the plaintiffs failed to comply with pre-suit notice requirements.  In addressing that issue, the court explained that defendants had sufficient notice, because "[t]he [CMS] filings . . . evidence Defendants' knowledge that they owed primary payments, including the primary payments for which Plaintiffs seek reimbursement."  Id.  This analysis, however, fails to address any of the issues raised by other courts, including that "primary payers must report to [the] CMS regardless of whether there was a conditional payment and regardless of whether or not there is an admission or determination of responsibility," AIG I, 2021 WL 1164091, at *6 n.11 (addressing and declining to follow ACE Am. Ins. Co., 974 F.3d at 1319), that there are "scenario[s] in which multiple insurers would be statutorily required to report the same claim to [the] CMS, but the medical services and items associated with the claim would not be reimbursable by each and every insurer as a primary payer," Hereford I, 2022 WL 118387, at *7, and that "even if defendants' reporting demonstrated their awareness that they were the primary payer for some accident related expenses, this conclusion does not satisfy plaintiffs' burden to plead facts demonstrating that defendants were responsible for the disputed medical expenses," Merchants Mut. Ins. Co., 2022 WL 2439410, at *7.

For these reasons, courts have either declined to follow Metro. Gen. Ins. Co. and ACE Am. Ins. Co. or questioned their application to a standing analysis.  See, e.g., Hereford II, 66 F.4th at 89 n.19 (noting that the Second Circuit's analysis "is in tension with the result reached by the Eleventh Circuit in [ACE Am. Ins. Co.]" and explaining that the court was not "persuaded"

because the Eleventh Circuit "considered this question only in passing"); <u>MSP Recovery Claims, Series LLC v. Tower Hill Prime Ins. Co.</u>, No. 1:20-cv-262-AW-GRJ, 2022 WL 6354405, at *2 (N.D. Fl. Oct. 7, 2022) (explaining that "[a]t issue in [<u>Metro. Gen. Ins. Co.</u>] was whether the complaint plausibly alleged one element of the MSP Act's cause of action:  demonstrated responsibility," which "relates only to the primary plan's responsibility to pay or reimburse Medicare or [MAOs]," but a "primary plan's failure to make primary payment or to reimburse the MAO [is what] causes . . . an injury in fact under Article III," so "[<u>Metro. Gen. Ins. Co.</u>] thus does not disturb this court's conclusion that Plaintiffs' complaint and Exhibit A, taken together, do not plead facts plausibly alleging any specific failure to pay or non-reimbursement fairly traceable to TH Preferred" (internal citations and quotation marks omitted)); <u>Merchants Mut. Ins. Co.</u>, 2022 WL 2439410, at *8 (explaining that "[t]o the extent that plaintiffs urge me to read [<u>ACE Am. Ins. Co.</u>], as authority that . . . factual allegations [regarding whether defendants acknowledged liability to pay for the treatments at issue here, even if those treatments were related to the accident] are unnecessary, or that reporting primary payer status to [the] CMS, without more, operates as an admission of liability for every medical expense allegedly related to an accident notwithstanding New York's required no-fault policy language, I decline to do so"); <u>Hereford I</u>, 2022 WL 118387, at *7 (explaining that "[a]lthough MSP argues that the statutory text and Eleventh Circuit case law support its contention that reporting to [the] CMS is an admission of primary payer responsibility, . . . the Court needs to know whether CMS data plausibly suggests that reported claims generate medical expenses that are reimbursable to the MAOs by the reporting entity" (internal citations and quotation marks omitted)); <u>AIG I</u>, 2021 WL 1164091, at *6 n.11 (explaining that "[t]his Court declines to follow th[e] holding [of <u>ACE Am. Ins. Co.</u>] because the Eleventh Circuit neither acknowledged nor addressed Defendants' argument here").

While MSPRC 44 need only plausibly plead injury-in-fact at this stage, "[n]either conclusory assertions nor unfounded speculation can supply the necessary heft." Hochendoner v. Genzyme Corp., 823 F.3d 724, 731 (1st Cir. 2016) (citing cases).  Ultimately, MSPRC 44's allegations provide no factual support for the proposition that all or even some of the medical expenses allegedly incurred by BCBSRI are reimbursable, solely because Defendants reported certain details of the claim to the CMS.  Accordingly, MSPRC 44 fails to allege plausibly that BCBSRI incurred reimbursable costs in connection with M.H.'s and J.O.'s claims and does not have standing to proceed with its claims.  See, e.g., Hereford II, 66 F.4th at 86–89 (affirming dismissal in Hereford I, 2022 WL 118387, at *7-8 for lack of standing for the same reason); Merchants Mut. Ins. Co., 2022 WL 2439410, at *4–8 (same); AIG I, 2021 WL 1164091, at *6–7 (same).  While the Court's conclusion as to this element is sufficient to deny standing, the Court considers MSPRC 44's further standing allegations for the sake of completeness.

   c) Whether BCBSRI Assigned the Claims to a Series LLC of MSPRC 44

Next, MSPRC 44 must allege plausibly that BCBSRI assigned M.H.'s and J.O.'s claims to one of MSPRC 44's Series LLCs.  An "assignee of a claim has standing to assert [an] injury in fact suffered by the assignor." MSP Recovery Claims, Series LLC v. QBE Holdings Inc., 965 F.3d 1210, 1217 (11th Cir. 2020) (alteration in original) (citation and internal quotation marks omitted).  A review of the assignment documents at issue demonstrates that MSPRC 44 has plausibly alleged a valid assignment to one of its Series LLCs.

The complaint includes excerpts of BCBSRI's assignment to MSP Recovery, LLC, MSP Recovery, LLC's assignment to Series 16-05-461, and Series 16-05-461's assignment to Series 44-20-461, D. 1 ¶¶ 59–63, but Defendants argue that these excerpts leave unclear what rights were transferred from BCBSRI, if BCBSRI retained any interest or control over the claims assigned,

and whether BCBSRI retained any rights, D. 29-1 at 10.  To address these concerns, MSPRC 44 included the assignment documents attached as an exhibit to its opposition, D. 35-1, which the Court can consider at this stage, Simmons v. Galvin, 575 F.3d 24, 30 n.5 (1st Cir. 2009) (explaining that "[i]n reviewing a motion [for judgment on the pleadings] under Rule 12(c) . . . we may consider documents the authenticity of which are not disputed by the parties; . . . documents central to plaintiffs' claim; [and] documents sufficiently referred to in the complaint" (second and third alterations in original) (citation and internal quotation marks omitted)).

On May 30, 2019, BCBSRI "irrevocably assigns[ed] . . . to MSP Recovery, and any of its successors and assigns, any and all of [BCBSRI]'s right" to (1) "all Claims for which it has sent claims data to MSP Recovery, LLC;" (2) "any and all causes of action, claims and demands of whatsoever nature relating to payments for healthcare services provided to [BCBSRI]'s members and enrollees, and related legal or equitable rights (including, but not limited to, subrogation) to pursue and/or recover monies related to the Claims that [BCBSRI]'s had, may have had, or has asserted against any party in connection with the Claims;" and (3) "all causes of action, claims, rights and demands of whatsoever nature, legal or equitable, against primary payers, Responsible Parties and/or third parties that may be liable to [BCBSRI] arising from or relating to the Claims, including claims under consumer protection statutes and laws." D. 35-1 at 3–4.  These three sets of claims were collectively known as the "Assigned Claims," per the agreement.  Id. at 4.  The assignment was "irrevocable and absolute."  Id.

Following that assignment, on June 10, 2019, MSP Recovery, LLC assigned to Series 16-05-461 "any and all of [MSP Recovery, LLC]'s right, title, ownership and interest in and to the" Assigned Claims.  Id. at 9.  The intent of this second assignment was "to transfer any and all rights title and interest that [MSP Recovery, LLC] obtained from [BCBSRI]" as to the Assigned Claims.

Id.  Finally, on October 22, 2020, Series 16-05-461 assigned to Series 44-20-461 "any and all of [Series 16-05-461]'s right, title, ownership, and interest in and to" the Assigned Claims.  Id. at 12. The intent of this final assignment was "to transfer any and all rights title and interest that [Series 16-05-461] obtained from the" second assignment.  Id.  Additionally, MSPRC 44 specifically alleged that "[a]t the time BCBSRI executed its assignment agreement in favor of Series 44-20-461, BCBSRI's right to seek reimbursements for [M.H.'s and J.O.'s] accident-related treatment was never assigned to or pursued by other recovery vendors.  BCBSRI held all recovery rights to [M.H.'s and J.O.'s] accident-related treatment and conveyed them to MSPRC 44.  BCBSRI did not retain the recovery right to [M.H.'s and J.O.'s] claim[s]."  D. 1 ¶¶ 33, 46.

Where the Court must draw reasonable inferences in MSPRC 44's favor, these allegations, coupled with the assignment documents, are sufficient to plausibly allege a valid assignment to one of MSPRC 44's Series LLCs.  See Hereford I, 2022 WL 118387, at *9.[4]

> d)   Whether MSPRC 44 Has the Right to Sue on Behalf of the Designated Series LLC that Received the Assignment

As Series 44-20-461 is the assignee M.H.'s and J.O.'s claims, the final element of the Court's injury-in-fact analysis is whether MSPRC 44 can sue Defendants on Series 44-20-461's behalf.  Neither party submitted briefing on this point, but the complaint includes several relevant allegations.  MSPRC 44 first alleges that it "is a Series LLC.  Under Delaware law, a Series LLC operates similarly to, but not the same as, a corporation and its subsidiaries.  MSPRC 44 is the master LLC.  Each individual Series entity forms a part of MSPRC 44, and MSPRC 44 owns and

---

[4] In Defendants' reply, they argue that the assignment between BCBSRI and MSP Recovery, LLC did not transfer all BCBSRI's rights, because it excluded "claims for the most recent two-year period."  D. 37-1 at 3.  The Court has reviewed the Assignments and cannot locate this language.  D. 35-1.  Even assuming, however, that such language was included, it appears that same would not affect the assignment of M.H.'s and J.O.'s claims because the Assignment was signed in 2019 and their accidents occurred in 2015.

controls each individual Designated Series entity."  D. 1 ¶ 9.  "[T]o maintain various claims recovery assignments separate from other company assets, and to account for and associate certain assets with certain series," MSPRC 44 created multiple designated series pursuant to Delaware law.  Id. ¶ 10.  Whether claims have been assigned directly to MSPRC 44 or to one of its various designated series, "MSPRC 44 possesses the right to sue on behalf of each Designated Series and pursue any and all rights, benefits, and causes of action arising from assignments to a Designated Series by way of its limited liability agreement," an agreement which also states that each designated series is owned and controlled by MSPRC 44.  Id. ¶¶ 10–11.  Finally, MSPRC 44 alleges that "[a]s permitted under Delaware law, MSPRC 44's limited liability agreement vests in the master LLC the right to initiate and maintain legal proceedings on behalf of its Designated Series entities individually or collectively.  Any claim or suit may be brought by MSPRC 44 in its own name, or in the name of its Designated Series, individually or collectively."  Id. ¶ 12.

Federal courts have diverged on their approach to this issue.  Some courts have determined that suing on behalf of a Designated Series is an abuse of the corporate form and concluded that the plaintiff did not have standing to assert its claims.  See N.Y. Cent. Mut. Fire Ins. Co., 2019 WL 4222654, at *6; MSP Recovery Claims, Series LLC v. USAA Gen. Indem. Co., No. 18-21626-CIV-ALTONAGA/Goodman, 2018 WL 5112998, at *12 (S.D. Fla. Oct. 19, 2018).  On the other hand, some courts have determined that there is no abuse of the corporate form because the relevant LLC agreements explicitly authorize the plaintiff to sue on behalf of its Designated Series.  See ACE Am. Ins. Co., 974 F.3d at 1319–20; MSP Recovery Claims, Series LLC v. Merchants Mut. Ins. Co., No. 1:19-cv-524-JLS-JJM, 2020 WL 8675835, at *8 (W.D.N.Y. Nov. 20, 2020), report and recommendation adopted sub nom. MSP Recovery Claims, Series LLC v. Merchants Mut. Ins. Corp., No. 19-cv-524 (JLS) (JJM), 2021 WL 784537 (W.D.N.Y. Mar. 1, 2021); MSP Recovery

Claims, Series LLC v. Farmers Ins. Exch., No. 17-cv-2559-CAS (PLAx), 2018 WL 5086623, at

*13–14 (C.D. Cal. Aug. 13, 2018).  A third camp of courts have refused to decide the issue, where

there are other standing defects.  See Hereford I, 2022 WL 118387, at *9; AIG I, 2021 WL

1164091, at *10–11.  Without the benefit of briefing on the issue, the Court concludes that the

most prudent approach is to decline to decide the issue, especially as it has already determined

MSPRC 44 has not sufficiently alleged injury-in-fact.  See id.

2.    *Causation*

The causation element "requires the plaintiff to show a sufficiently direct causal connection

between the challenged action and the identified harm."  Katz v. Pershing, LLC, 672 F.3d 64, 71

(1st Cir. 2012) (citing Lujan, 504 U.S. at 560).  This direct causal connection necessary to confer

standing cannot be "overly attenuated."  Donahue v. City of Boston, 304 F.3d 110, 115 (1st Cir.

2002) (citing Lujan, 504 U.S. at 560).  To satisfy causation in this context, MSPRC 44 must

plausibly allege that (1) Defendants issued the relevant insurance policy and (2) the alleged injuries

would have been covered under such policy and/or settlement agreements entered into by

Defendants.  AIG I, 2021 WL 1164091, at *11–14; see Hereford I, 2022 WL 118387, at *9–11.

As to the first element, MSPRC 44 admits that it is unsure which Defendant issued the

relevant insurance policies.  D. 1 ¶¶ 36, 49.  For their part, Defendants denied those allegations in

the complaint,  D. 13 ¶¶ 36, 49, and the allegations that their insureds were responsible for the

accidents that caused M.H.'s and J.O.'s injuries.  D. 13 ¶¶ 32, 45.  Nevertheless, not only did

MSPRC 44 allege that Defendants purposefully reported the plan name to the CMS as "Quincy

Mutual Insurance Group" and "Quincy Insurance" to obfuscate its primary payer status, D. 1 ¶¶

36, 49, but the Court must also treat as false those assertions in the answer that contradict the

complaint, Santiago v. Bloise, 741 F. Supp. 2d 357, 360 (D. Mass. 2010) (citing cases).

24

Even assuming, however, that MSPRC 44 plausibly alleged that Defendants issued the relevant insurance policies, it has not shouldered its burden as to the second consideration for causation.  The complaint is silent as to any allegations from which the Court could infer that M.H.'s and J.O.'s injuries would have been covered by the insurance policies or settlement agreements allegedly issued or entered into by Defendants.  As an initial matter, MSPRC 44 alleges no facts regarding the type of insurance Defendants' insured had or regarding the settlement Defendants allegedly entered into with M.H. and J.O., respectively.  See generally D. 1.  Without such information, it is unclear whether certain medical expenses might have been excluded from insurance coverage or the settlements.  See MAO-MSO Recovery II LLC v. Nationwide Mut. Ins. Co., No. 2:17-cv-263, No. 2:17-cv-164, 2018 WL 4941111, at *3 n.3 (S.D. Ohio Feb. 28, 2018) (noting that plaintiffs failed to plead relevant facts, including "some information regarding the settlement agreements reached (e.g., the date, parties, scope of claims covered), and the relationship between the payments made by the MAO and the contents of the settlement agreements").

Moreover, the complaint includes no "actual allegations concerning the accidents, the nature of the injuries sustained, nor the type of medical treatments received such that the court could reasonably conclude that the treatments that [M.H. and J.O.] allegedly received were related to an injury sustained in the alleged accidents."  Merchants Mut. Ins. Co., 2022 WL 2439410, at *5.  The only relevant allegations in the complaint about the accident, the injuries, and the medical treatment state legal conclusions, which the Court need not credit.  D. 1 ¶ 31 (alleging that "[a]s a direct and proximate result of the incident, M.H. sustained injuries that required medical items and services"), id. ¶ 44 (same alleged as to J.O.); id. ¶ 32 (alleging that "Quincy's insured [was] responsible for the incident"), id. ¶ 45 (same alleged as to J.O.) ; id. ¶ 33 (alleging that the treatment

was "accident-related"), id. ¶ 46 (same alleged as to J.O.); see Merchants Mut. Ins. Co., 2022 WL

2439410, at *5.  Accordingly, "[w]ithout at least some allegations about the nature of the accidents,

there is nothing beyond Plaintiff's *ipse dixit* and the fact that the medical care was provided on the

date of or subsequent to the date of the accident that links the alleged insurance policies or

settlement agreements to the medical items and services provided."  AIG I, 2021 WL 1164091, at

*12.

        To support these conclusory allegations, MSPRC 44 attached two spreadsheets to its

complaint, which "list . . . [M.H.'s and J.O.'s] diagnosis codes and injuries in connection with

[their] accident-related treatment."  D. 1 ¶¶ 33, 46; see D. 1-2; D. 1-3.  MSPRC 44, however,

includes no further allegations tying these codes to actual diagnoses, injuries, or treatments.  See

Merchants Mut. Ins. Co., 2022 WL 2439410, at *6.[5]  The Court, therefore, is left to speculate and

piece together the accident, injuries, treatment, insurance policy, and settlement.

        Interpreting these diagnostic codes and injuries illustrates the issue.  For example,

according to M.H.'s diagnostic codes and injuries, this person presumably was involved in some

sort of accident on August 13, 2015, two ambulances were called and six computed tomography

("CT") scans were performed (two of the lumbar spine, two of the thoracic spine, and two of the

---

[5] Injury-in-fact and causation analyses are not necessarily interdependent, but they are here, as the Court's analysis as to both above makes clear.  Hereford II, 66 F.4th at 85 (explaining that "as pleaded, injury-in-fact and causation rise and fall together.  A plaintiff's showing of injury-in-fact and of causation for that injury need not always be interdependent in cases regarding reimbursement obligations under the MSP Act, of course.  We conclude that they are in this case only because MSP alleges that it made payments that were reimbursable specifically by Hereford, and the only fact it alleges to justify that its payments were both reimbursable generally and reimbursable by Hereford in particular was that Hereford reported the claims to CMS under Section 111.  In sum, if MSP has adequately alleged injury, it has adequately established causation").

cervical spine).[6] See D. 1-2 at 3.  Without any supporting or clarifying allegations in the complaint, it is not clear whether all of these medical services were necessary because of the accident and why there were two ambulances and two sets of each CT scan (i.e., was one for M.H. and the other for Defendants' insured, were all six CT scans for M.H., or was BCBSRI mistakenly billed twice for every medical service).  The Court can also infer from theses codes that, on August 21, 2015, an individual (presumably M.H.) received services at an established outpatient facility.[7] See D. 1-2 at 3.  The question remains whether this outpatient care was related to the accident or whether M.H. had a previously made appointment with their doctor that had nothing to do with the accident.  Cf. MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co., No. 1:17-cv-1537, 2019 WL 6311987, at *4–5 (C.D. Ill. Nov. 25, 2019), appeal dismissed, No. 20-1268, 2020 WL 4982642 (7th Cir. July 24, 2020) (allowing summary judgment where plaintiff did not have standing over exemplar claim because post-accident appointments were unrelated to the accident and so the insurer was not the primary payer and the MAO had no right to reimbursement).

Similar questions arise after reviewing J.O.'s diagnosis codes and injuries.  On September 20, 2015, J.O. was presumably involved in some sort of accident, two ambulances were called,

---

[6] The exhibit lists the following CPT codes twice:  72131, 72128, 72125, and 99284.  D. 1-2 at 3.  CPT code 72131 appears to refer to a lumbar spine CT scan.  See 72131, https://www.findacode.com/code.php?set=CPT&c=72131 (last visited June 20, 2023).  CPT code 72128 appears to refer to a thoracic spine CT scan.  See 72128, https://www.findacode.com/code.php?set=CPT&c=72128 (last visited June 20, 2023).  CPT code 72125 appears to refer to a cervical spine CT scan.  See 72125, https://www.findacode.com/code.php?set=CPT&c=72125 (last visited June 20, 2023).  CPT code 99284 appears to refer to an emergency visit.  See 99284, https://www.findacode.com/code.php?set=CPT&c=99284 (last visited June 20, 2023).

[7] The exhibit lists CPT code 99213.  D. 1-2.  CPT code 99213 appears to refer to an established outpatient visit.  See 99213, https://www.findacode.com/code.php?set=CPT&c=99213 (last visited June 20, 2023).

one radiologic exam of the shoulder, knee, and pelvis was performed, and one cervical spine CT scan was performed.[8]  See D. 1-3 at 3.  The following day, on September 21, 2015, a prescription was filled at a pharmacy.  Id. at 6.  Three days later, on September 24, 2015, an individual (presumably J.O.) received services at an established outpatient facility.[9]  Id. at 3.  As before, the Court is left questioning whether all these medical services were related to the accident, whether all these medical services were performed for J.O.'s benefit, whether some were performed for Defendants' insured's benefit, whether the prescription that was filled was for some pre-existing condition that does not relate to the accident, and whether the outpatient care related to the accident.

This speculation "calls into question the connection between the accident and the medical services provided to [M.H. and J.O.]" and, [t]herefore, [MSPRC 44] has not adequately alleged that [Defendants] caused [BCBSRI] harm as to the [M.H. and J.O.] claim[s]."  Hereford I, 2022 WL 118387, at *10; see AIG I, 2021 WL 1164091, at *13.  Accordingly, MSPRC 44 has not

---

[8] The exhibit lists CPT code 99284 twice, and the following CPT codes once:  73030, 73560, 72125, 72170.  D. 1-3 at 3.  CPT code 99284 appears to refer to an emergency visit.  See 99284,  https://www.findacode.com/code.php?set=CPT&c=99284 (last visited June 20, 2023). CPT code 73030 appears to refer to a shoulder radiologic exam.  See 73030, https://www.findacode.com/code.php?set=CPT&c=73030 (last visited June 20, 2023).  CPT code 73560 appears to refer to a knee radiologic exam.  See 73560, https://www.findacode.com/code.php?set=CPT&c=73560 (last visited June 20, 2023).  CPT code 72125 appears to refer to a cervical spine CT scan.  See 72125, https://www.findacode.com/code.php?set=CPT&c=72125 (last visited June 20, 2023).  CPT code 72170 appears to refer to pelvis radiologic exam.  See 72170, https://www.findacode.com/code.php?set=CPT&c=72170 (last visited June 20, 2023).  While the exhibit also lists CPT code 71020, it appears that this code was deleted, replaced, or expanded. See 71020, https://www.findacode.com/code.php?set=CPT&c=71020 (last visited June 20, 2023).

[9] The exhibit lists CPT code 99214.  D. 1-3 at 3.  CPT code 99214 appears to refer to an established outpatient visit.  See 99214, https://www.findacode.com/code.php?set=CPT&c=99214 (last visited June 20, 2023).

plausibly alleged either injury-in-fact or causation, and, therefore, does not have standing to proceed with its claims.[10]

## VI.  Conclusion

For these reasons, the Court ALLOWS Defendants' motion for judgment on the pleadings. D. 29.[11]

So Ordered.

/s/ Denise J. Casper
United States District Judge

---

[10] Because the Court concludes that MSPRC 44 does not have standing, it does not reach Defendants' other arguments in support of their motion for judgment on the pleadings.  D. 29-1 at 13–26.

[11] To the extent Defendants sought a dismissal of the complaint with prejudice, D. 29 at 1, that request is denied, Hochendoner, 823 F.3d at 736 (explaining that "a dismissal for lack of subject matter jurisdiction normally operates without prejudice," that such "approach makes eminently good sense since a want of jurisdiction deprives a court of the authority to enter a judgment on the merits of the claims sub judice," "[c]ourts routinely apply this principle to dismissals for lack of Article III standing and "hold[ing] that a dismissal for lack of Article III standing must operate without prejudice" (internal citations omitted)).